## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SHARON WINKFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 19 C 1721 |
| | ) | |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendant Chicago Transit Authority's ("CTA") Motion for Summary Judgment under Federal Rule of Civil Procedure 56. For the following reasons, the Court grants the Motion in part.

## BACKGROUND

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are undisputed unless otherwise noted.

Plaintiff Sharon Winkfield began working for the CTA as a Signal Helper in February 1998. Winkfield injured her ankle while working in January 2002. Since that injury, Winkfield has walked with a visible limp, but does not have any issues with walking, standing, or balance. In 2003 she was cleared to resume working but, under

the terms of a workers' compensation settlement, she was on "open medical" and could request, and the CTA would provide, physical therapy as needed. In January 2004, Winkfield transitioned to the role of Signal Maintainer.

The CTA describes the job of Signal Maintainer as: "Inspects, tests, repairs, and maintains carbone signal equipment, interlockings, block signals, grade crossings and parking lot gate mechanisms within the [CTA's] rail system." Dkt. # 57-6, pg. 1. The primary responsibilities of the position include "inspection, adjustment, repair and scheduled maintenance of all interlockings, block signals, automatic train control-train car mounted equipment, track audio equipment, grade crossing gates and a variety of related equipment." *Id.* A Signal Maintainer must submit to drug and alcohol testing as mandated by the Federal Transportation Administration, have a valid Illinois driver's license, have prior experience as a CTA Signal Helper, and pass both phases of the CTA's Signal School with a grade average of 75% or more.

There are two different Signal Maintainer jobs: Carbone Signal Maintainers, who inspect and repair the physical trains, and Wayside Signal Maintainers, who maintain the equipment on the CTA's wayside (i.e., right-of-way). While both jobs fall under the same job description, Winkfield asserts it does not adequately describe the specific job of a Carbone Signal Maintainer. For example, the job description says work will be performed outdoors 90% of the time, but Winkfield says she worked indoors 100% of the time. Further, the job description states a Signal Maintainer is required to possess a "thorough working knowledge of CTA signal interlockings, power operated switch

2

machines, train stops, AC track circuits and grade crossing mechanisms." Dkt. # 57-6, pg. 2. Winfield says, however, she was not required to have such knowledge as a Carbone Signal Maintainer.

Under the collective bargaining agreement ("CBA") with Winkfield's union, the International Brotherhood of Electrical Workers Local 9 ("IBEW"), Signal Maintainers participated in a job pick, which allows them to select the position they will work in. Pick positions were based on seniority. But not all Signal Maintainers participated in the pick process because some positions were excluded from the job pick process and others were permanent positions as a disability-based accommodation.

Between 2004 and 2017, Winkfield was able to select the Carbone Signal Maintainer job. But during the job pick on March 17, 2017, Winkfield was unable to select the position. She therefore chose an audio gang position, which was an outside job on the wayside. After the selection, Winkfield contacted Senior Manager of Signal Maintenance Phil Chavez seeking to modify her schedule because she had small children that needed to be supervised; she was later informed by Audio Gang Foreman Mike Ross that she would not be able to modify her schedule. Winkfield also informed Chavez of her injury and a week later told him that her rail safety card was expired and she was concerned about working on the wayside. Chavez contacted Senior Manager of Infrastructure Administration Jeannine Messina and scheduled a meeting with Winkfield.

On March 27, 2017, Winkfield met with Messina, Chavez, and an IBEW representative. According to Chavez and Messina, Winkfield was unable to walk, was unstable, and could not take one step without holding on to something. Winkfield admits she has walked with a limp since the 2002 incident, but disagrees that she was unstable or needed to hold on to something. Based on her observations, Messina removed Winkfield from service and advised Winkfield of short-term disability options. Winkfield says Messina was intimidating, mean, hostile, and loud throughout the meeting. She also says Messina refused to accept paperwork about the 2002 injury and "open medical" status, saying the paperwork was not in her system. Winkfield also claims Messina accused her of trying to get out of work, which Messina denies.

Also on March 27, 2017, in response to an email from the workers' compensation department about Winkfield's 2002 injury, Messina said "FYI…..get your mind right…. just saying…." Dkt. # 57-23, pg. 1. Chavez replied "I believe you called it a waddle or wobble …I almost started to laugh." *Id.* Then Messina said, "I know, I didn't know what else to say…. webbles waddle but they don't fall down…." *Id.* Messina later testified that she "was describing when Ms. Winkfiled was in the office walking in." Dkt. 57-7, 137:1–2.

On March 29, 2017, Winkfield filled out an accommodation request form stating she could not work on the wayside and requested to remain inside the shops. The CTA's Accommodation Review Committee ("ARC") denied Winkfield's request. After several months on unpaid status, the CTA offered Winfield a Customer Service

4

Assistant ("CSA") position. This position paid only $11 per hour without a set schedule, no vacation days, was part of a different union, and had no seniority. Winkfield says Georgette Hampton, a Human Resources Representative and one of three ARC panel members, called to offer the CSA position, but angrily hung up after Winkfield said she needed to discuss the offer with her husband. On November 1, 2017, Winfield retired from the CTA.

Winkfield insists she was forced to retire because she felt that there was no future for her at the CTA and she would earn more collecting her pension than working as a CSA. She asserts her injury would not have prevented her from being able to work as a Carbone Signal Maintainer. Two medical reports from 2017 indicate she was physically able to work inside the shop. *See* Dkt. # 57-25; Dkt. # 57-26.

Based on these events, Winkfield filed a two-count complaint against the CTA alleging failure to accommodate under the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/2-101 *et seq*. (Count I), and disability discrimination and a hostile work evironment under the ADA and IHRA (Count II). The CTA now moves for summary judgment on both counts.

## **LEGAL STANDARD**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014) (cleaned up).

In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016). The nonmovant "must go beyond the pleadings" to demonstrate that there is evidence "upon which a jury could properly proceed to find a verdict in [their] favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). And "[c]onclusory statements, not grounded in specific facts" cannot defeat a motion for summary judgment. *Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016) (cleaned up).

Not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted). In deciding a motion for summary judgment, the Court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The Court cannot weigh conflicting evidence, assess the credibility of witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc.*, 477

6

U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704–
05 (7th Cir. 2011).

Local Rule 56.1 requires a party moving for summary judgment to submit a
statement of material facts as to which the movant contends there is no genuine issue
and entitles the movant to judgment as a matter of law. The party opposing the motion
for summary judgment is then required to file "any opposing affidavits and other
materials referred to in [Federal Rule of Civil Procedure 56(e)]" and a "concise
response" to the movant's statement of facts containing "any disagreement, specific
references to the affidavits, parts of the record, and other supporting materials." L.R.
56.1(b)(1), (3).

"A general denial is insufficient to rebut a movant's factual allegations; the
nonmovant must cite specific evidentiary materials justifying the denial." *Malec v.
Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Local Rule 56.1(b)(3)(C) is not satisfied
by "purely argumentative denials," *id.*, or "evasive denials that do not fairly meet the
substance of the material facts asserted," *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233
F.3d 524, 528 (7th Cir. 2000). If a response to a statement of material fact provides
only extraneous or argumentative information, this response will not constitute a proper
denial of the fact, and the fact is admitted. *See Graziano v. Vill. of Oak Park*, 401 F.
Supp. 2d 918, 936 (N.D. Ill. 2005). Similarly, if a statement of fact contains a legal
conclusion or otherwise unsupported statement, including a fact that relies upon
inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d

7

738, 742 (7th Cir. 1997). "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner[;] it is not intended as a forum for factual or legal argument." *Malec*, 191 F.R.D. at 585.

## DISCUSSION

We first address the evidentiary issues raised by the CTA. In its Reply brief, the CTA seeks to have the facts submitted in its Local Rule 56.1 Statement of Undisputed Material Facts deemed admitted because of Winkfield's alleged noncompliance with Rule 56.1. The CTA first contends Winkfield's "qualified admissions and partial denials" should be deemed admitted because they do not raise any dispute of *material* fact. But because determining whether a disputed fact is material is one of the goals of a summary judgment motion, we address this argument together with the parties' substantive summary judgment arguments, to the extent necessary. *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1020 (N.D. Ill. 2018) ("Rather than attempt to winnow the voluminous statements to only material paragraphs in the abstract . . . addressing materiality questions as they pertain to particular issues to be the better course because it may obviate the need to analyze each disputed paragraph.").

Next, the CTA contends Winkfield's responses contain legal arguments and conclusory statements, and are not supported by the record. The Court will disregard any legal arguments or conclusions made by the parties in their Local Rule 56.1 Statements, as those are not facts. *See id.* at 1018. And any asserted facts unsupported by the record will be disregarded when relevant to a material issue of the case. *Id.* at

1019 ("Because these objections turn out to be issue-specific, fact-intensive, and sometimes immaterial, the court addresses them infra to the extent they bear on material issues."). However, the Court will not wholly disregard Winkfield's responses and deem all of the CTA's facts admitted.

Similarly, the CTA takes issue with Winkfield's Local Rule 56.1 Statement of Additional Undisputed Material Facts. It asks the Court to disregard all those facts because they are not short and concise as required by Local Rule 56.1. The CTA contends each paragraph should have only one to two facts. But the Court "does not count facts or sentences mechanically." *Id.* at 1018. Indeed, a "statement of material facts that presents one fact at a time per paragraph would not be an efficient manner in which to present a statement of material facts and would not be consistent with Local Rule 56.1." *Id.*

While the Court agrees Winkfield's paragraphs are not particularly concise, the facts contained in the paragraphs bear a logical relationship to each other, so keeping them together makes sense. *Id.*; *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632–33 (7th Cir. 2009) (finding district court did not abuse discretion where it did not require the defendant to "unbundle" seven related factual assertions that supported a single conclusion). Therefore, the Court will not wholly disregard Winkfield's Statement of Facts "as doing so would in some cases throw out a properly supported assertion." *Id.*

Moving to the merits of the Motion, we begin with the CTA's argument that Winkfield's failure to accommodate claim fails.

9

## I.      Count I

The ADA prohibits employers from discriminating against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" constitutes discrimination under the ADA, unless the employer can demonstrate that the accommodation would impose an "undue hardship." *Id.* § 12112(b)(5)(A); *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241 (7th Cir. 2018). To establish a failure to accommodate claim, Winkfied must show: (1) she is a qualified individual with a disability; (2) the CTA was aware of her disability;[1] and (3) the CTA failed to reasonably accommodate the disability. *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014). An IHRA claim for disability discrimination is analyzed under the same framework as an ADA claim. *McKay v. Vitas Healthcare Corp. of Ill.*, 232 F. Supp. 3d 1038, 1043 (N.D. Ill. 2017). Accordingly, the Court will analyze both claims under the ADA.

### a.      Qualified Individual

The CTA first contends Winkfield is not a "qualified individual" under the ADA. A qualified individual means "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Kauffman v. Petersen Health Care VII, LLC*, 769

---

[1] The CTA does not contest this element for purposes of this Motion.

F.3d 958, 959 (7th Cir. 2014) (citing 42 U.S.C. § 12111(8)).  When determining whether an individual is a "qualified individual," courts consider (1) whether an individual possesses "the requisite skill, experience, education and other job-related requirements of his employment position, and (2) can perform the essential functions of the position held or desired, with or without reasonable accommodation."  *Budde v. Kane Cnty. Forest Pres.*, 597 F.3d 860, 862 (7th Cir. 2010) (citing 29 C.F.R. § 1630.2(m)).

The parties' arguments elucidate a material factual dispute about Winkfield's qualifications.  The CTA argues Winkfield is not qualified because she was not rail safety certified and, because of her disability, she could not walk the wayside.  In support, the CTA points to the job description for the Signal Maintainer position, which says a Signal Maintainer must be rail safety certified and walk the wayside.  Dkt. # 57-6.

On the other hand, Winkfield argues the job description is inaccurate.  The job description, she says, captures requirements of a Wayside Signal Maintainer that are not true for Carbone Signal Maintainers, and vice-versa.  At least one of the CTA's witnesses agrees that the job description encompasses both the Carbon and Wayside Signal Maintainer jobs, but the two positions have different day-to-day duties.  Dkt. # 57-8, 62:1-8.  Moreover, rail safety certification may not have been necessary for the position inside the shop.  *See* Dkt. # 57-46, pg. 1.  Winkfield also claims she was qualified because of the fact she worked as Carbone Signal Maintainer for nearly 14 years without issue.

As can be seen, we are left with a factual dispute about Winkfield's qualifications that must be left to the jury. *See VanOoteghem v. Will Cnty. Forest Preserve Dist.*, 2020 WL 3868714, at *8 (N.D. Ill. 2020) (Kocoras, J.) (denying motion for summary judgment because of factual disputes over the plaintiff's qualifications to perform her job).

### b.    Reasonable Request for Accommodation

Even assuming Winkfield was qualified, her failure to accommodate claim may still fail if her requested accommodation was not reasonable. Recall that failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" constitutes discrimination under the ADA, unless the employer can demonstrate that the requested accommodation would impose an "undue hardship." 42 U.S.C. § 12112(b)(5)(A); *Rodrigo*, 879 F.3d at 241. An employer may have to assign an employee to a different position as a reasonable accommodation; however, this duty is typically limited to vacant positions, meaning an employer is not required to "bump" other employees to create a vacancy. *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996).

The Supreme Court has clarified the application of this rule to employers who use seniority systems for job assignment and promotion purposes. *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002). Ordinarily, where a requested accommodation conflicts with bargained for seniority systems, the accommodation would be unreasonable under the ADA. *Id.* at 403. However, the plaintiff can show

12

that the requested accommodation is reasonable if "special circumstances" exist that alter employees' bargained for expectations. *Id.* at 405. For example, "[t]he plaintiff might show that the system already contains exceptions such that, in the circumstances, one further exception is unlikely to matter." *Id.*

Winfield has shown just that. She points to another Signal Maintainer, Manny Medina, who requested and was granted a permanent position as a Carbone Signal Maintainer. Because his position is permanent, Medina does not participate in the job selection process. Such an accommodation is possible, as the ARC reaches out to IBEW to make an arrangement. When Winkfield requested an accommodation, there were open Carbone Signal Maintainer jobs, but the ARC did not contact IBEW. Therefore, a reasonable jury could conclude that Winkfield's request to work permanently as a Carbone Signal Maintainer was reasonable, just like Medina.

Nevertheless, the CTA also contends it is entitled to summary judgment because it participated in the "interactive process" and offered Winkfield a reasonable accommodation that she denied. After an employee's initial disclosure of her disability, "the ADA obligates the employer to engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *E.E.O.C. v. Sears, Roebuck, and Co.*, 417 F.3d 789, 804 (7th Cir. 2005). The interactive process allows employers to work with the disabled employee "so that, together, they might identify the employee's precise limitations and discuss accommodations which might enable the employee to continue working." *Hendricks-Robinson v. Excel Corp.*,

13

154 F.3d 685, 693 (7th Cir. 1998). The Seventh Circuit has described the interactive process as having "give-and-take" elements, such that "if the employee has requested an appropriate accommodation, the employer may not simply reject it without offering other suggestions or at least expressing a willingness to continue discussing possible accommodations." *Sears*, 417 F.3d at 806.

The ADA lists several forms of reasonable accommodations, including "reassignment to a vacant position." 42 U.S.C. § 12111(9). According to the EEOC guidelines, an employer who utilizes reassignment as a reasonable accommodation for a current employee "should reassign the individual to an equivalent position, in terms of pay, status, etc., if the individual is qualified, and if the position is vacant within a reasonable amount of time." *EEOC Interpretive Guidance on Title I of the Americans with Disabilities Act*, 29 C.F.R. App. § 1630.2(o) (2016).

Here, the CTA says no Signal Maintainer jobs were available, so it offered Winkfield a CSA position. This position was part-time, paid $11.00 per hour (about one-third of what Winkfield was paid as a Signal Maintainer), did not include benefits, and was part of a different union. The CTA argues it is only obligated to provide some reasonable accommodation, not the accommodation that Winkfield requests or prefers. *See Malabarba v. Chi. Trib., Co.*, 149 F.3d 690, 699 (7th Cir. 1998). More specifically, the CTA contends it need only transfer Winkfield to a position for which she is otherwise qualified, not specifically an inside shop job. *See Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998). However, the CTA's contentions are only true

14

if the employee's requested position is unavailable. As discussed above, it appears possible for the selection process to be bypassed with a permanent position and Winkfield shows evidence that there were open Signal Maintainer positions available.

At bottom, there is evidence supporting both the CTA and Winkfield's positions. A trial is therefore necessary to resolve the factual disputes. Accordingly, the CTA's Motion is denied with respect to Winkfield's failure to accommodate claim.

## II. Count II

In Count II, Winkfield alleges a hostile work environment and disability discrimination. We begin with the hostile work environment claim.

### a. Hostile Work Environment

To establish as hostile work environment claim, Winkfield must establish that (1) she was subject to unwelcome harassment; (2) the harassment was based on her disability; (3) the harassment was so severe or pervasive that it altered the conditions of her work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 833–34 (7th Cir. 2015); *see also Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 851 (7th Cir. 2019) (holding that hostile work environment claims are cognizable under the ADA).

The law "does not prohibit all verbal or physical harassment in the workplace." *Silk v. City of Chi.*, 194 F.3d 788, 804 (7th Cir. 1999) (cleaned up). A plaintiff must show the workplace was both subjectively and objectively hostile, meaning a

15

reasonable person would find the workplace hostile and the plaintiff actually perceived it as such. *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005). The Court considers the totality of circumstances, including: the frequency and severity of conduct; whether it is threatening and/or humiliating or merely offensive; and whether the harassment unreasonably interferes with an employee's work. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005). "[T]he threshold for plaintiffs is high, as the workplace that is actionable is one that is 'hellish.'" *Id.* (cleaned up).

Winkfield bases her hostile work environment claim on: Messina acting "hostile" and refusing to accept papers; inferring Winkfield was lazy; threatening to write Winkfield up; accusing her of lying; refusing to return her to work; and "of particular significance, mocking Sharon and her disability in an email with Chavez." Dkt. # 64, pg. 13. However, we find these actions do not support a hostile work environment claim.

First, Winkfield was not privy to the emails when they were sent. Though they are highly unprofessional, those emails are akin to derogatory remarks made outside Winkfield's presence, which the Seventh Circuit has repeatedly held cannot sustain a hostile work environment claim. *See, e.g.*, *Mannie*, 394 F.3d at 983; *Whittaker*, 424 F.3d at 645. Second, Messina's other actions, even assuming they occurred in the manner Winkfield describes, are not particularly severe or pervasive. While there is no "magic number" of incidents required, *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000), the incidents appear isolated and, again while unprofessional, are

not "hellish." Thus, the work environment was neither severe nor pervasive as is necessary to support a hostile work environment claim.

Winkfield's reliance on *Maggio v. Konica-Minolta Business Solutions, USA*, 578 F. Supp. 2d 969 (N.D. Ill. 2008), is inapposite. There, Judge Kennelly denied the defendant's motion for summary judgment on a hostile work environment claim where: the plaintiff's supervisors and coworkers called him names for parking in a handicapped parking space; one of his supervisors vandalized his car for parking in a handicapped spot; his supervisors blew up at him about his disability; two coworkers asked another coworker to take pictures to "assess" the plaintiff's disability, which the coworker did; his coworkers stole work carts, which were part of the plaintiff's disability accommodation; he was denied necessary computer training and computer use because the training center was on the second floor, which he could not access; he received anonymous notes calling him a "fat ass;" and he received a performance evaluation that led to the denial of an annual raise. *Id.* at 977–78. Judge Kennelly determined "[b]y themselves, these incidents likely would not permit a reasonable jury to find an abusive environment," but "in its totality" could support a finding of a hostile work environment. *Id.* at 978.

Here, simply put, the conduct does not rise anywhere near the level of the conduct in *Maggio*. Indeed, the Seventh Circuit has found much worse environments than here to be insufficient to support a hostile work environment claim. *See Whittaker*,

424 F.3d at 646 (discussing cases). Accordingly, the Motion is granted on Winkfield's hostile work environment claim.

### b. Disability Discrimination

The CTA next argues that Winkfield's disability discrimination claim fails. In assessing employment discrimination claims, the Court no longer separates the evidence into "direct" and "indirect" methods of proof, as the CTA seems to suggest. Instead, "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz v. Werner Enters.*, 834 F.3d 760, 766 (7th Cir. 2016). To survive summary judgment, a plaintiff must present evidence that would allow a reasonable jury to conclude that her disability caused the adverse employment action. *Id.*; *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 573 (7th Cir. 2021).

In other words, under *Ortiz*, we "ask whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021). To guide us in this analysis, we consider whether Winkfield has shown: "(1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and (3) she suffered from an adverse employment action because of her disability." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 839 (7th Cir. 2012); *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017).

We believe Winkfield's discrimination claim should proceed to trial for two reasons. First, there remains a factual dispute about whether Winkfield was qualified

18

for the Carbone Signal Maintainer job, as discussed above. Second, a reasonable jury could find Winkfield suffered an adverse employment action, though on only one of the theories she advances.

The Seventh Circuit has explained "not everything that makes an employee unhappy is an actionable adverse action." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007). To be actionable, an adverse employment action must "materially alter the terms or conditions of employment," *Porter v. City of Chi.*, 700 F.3d 944, 954 (7th Cir. 2012), and it must be "more disruptive than a mere inconvenience or an alteration of job responsibilities," *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009). This may be, for example, "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013) (cleaned up).

Here, Winkfield offers two theories of adverse employment actions. First, Winkfield says her retirement amounts to a constructive discharge. "Constructive discharge, like actual discharge, is a materially adverse employment action." *E.E.O.C. v. Univ. of Chi. Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002). To establish constructive discharge, an employee must ordinarily show that her working conditions were unbearable due to a discriminatory work environment "even more egregious than the high standard for hostile work environment." *Id.* at 331–32. "But that is not the only

19

method of demonstrating constructive discharge. When an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge." *Id.*

We do not believe Winkfield's retirement was a constructive discharge, although for different reasons than the CTA proffers. For a retirement or resignation to rise to the level of a constructive discharge, it must be clear to a reasonable employee that an actual firing "was an imminent and inevitable event." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 680 (7th Cir. 2010); *see also Wright v. Ill. Dep't. of Child. and Family Servs.*, 798 F.3d 513, 528–29 (7th Cir. 2015). The Seventh Circuit's case law makes our analysis straightforward.

In *EEOC v. University of Chicago Hospitals*, the former employee knew of her supervisor's "intent, plan, and attempt to terminate her," and arrived to work one day to find her belongings packed up and her office being used for storage. 276 F.3d at 332. The Seventh Circuit concluded "her employer made reasonably clear to her that she had reached the end of the line" and therefore "demonstrated that a reasonable employee standing in [the employee's] shoes would have believed that had she not resigned, she would have been terminated." *Id.*

By contrast, in *Wright*, a plaintiff chose to retire while disciplinary proceedings were ongoing. 798 F.3d at 517–20. The Seventh Circuit held that the plaintiff failed to show she was constructively discharged because the outcome of the disciplinary

20

proceedings was not definite, there was no evidence the employer had decided to terminate her, and no conduct by her supervisors suggested termination was certain. *Id.* at 530.

Here, like *Wright*, there is no indication that Winkfield would have been fired if she did not take the CSA position or retire. Perhaps one could speculate based on the apparent lack of communication by the CTA, but "[l]itigation to determine what *would* have happened . . . is a poor substitute for the actual results of real deliberation within the employer's hierarchy." *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333–34 (7th Cir. 2004); *see also Wright*, 798 F.3d at 531 ("That Ms. Wright *may* have been discharged at the conclusion of the disciplinary proceeding does not amount to a constructive discharge."). Winkfield has not shown that she would have been imminently fired and, therefore, her retirement was not an adverse employment action. *See Chapin*, 621 F.3d at 679 (noting "a working condition does not become intolerable or unbearable merely because the prospect of discharge lurks in the background") (cleaned up).

Second, Winkfield says her involuntary removal from work without pay was an adverse employment action. We agree that a reasonable jury could conclude that this was an adverse employment action. The involuntary removal clearly materially altered Winkfield's employment and was more than an inconvenience. But, like the issue of whether Winkfield was qualified for the position, the material facts are in dispute. If Winkfield's physical condition was as bad as Messina describes, then the CTA may

21

have been right to remove Winkfield. On the other hand, if Winkfield's limp was no worse than it had been since the 2002 incident and was able to work the job, then the CTA's actions may have been discriminatory and potentially pretextual based on the emails. Because we cannot weigh the evidence or assess witness credibility on a motion for summary judgment, the resolution of this issue must be left to the jury.

At bottom, a reasonable jury could conclude Winkfield was discriminated against because of her disability based on her involuntary removal from work. Accordingly, the CTA's Motion is denied on Winkfield's disability discrimination claim based on the removal from service, but granted for her disability discrimination claim based on constructive discharge.

## **CONCLUSION**

For the reasons mentioned above, the Court grants-in-part and denies-in-part the CTA's Motion for Summary Judgment. (Dkt. # 55). Telephonic status hearing set for May 5, 2022 at 10:20 a.m. It is so ordered.


Dated: 04/07/2022

_____

Charles P. Kocoras
United States District Judge

22